108 T.C. No. 11

UNITED STATES TAX COURT

ASAT, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3173-95.                    Filed March 31, 1997.

P, a wholly owned domestic subsidiary, purchased
assembly services from its parent, a foreign
corporation.  During an IRS audit of P's 1991 Federal
corporate income tax return, the IRS notified P that it
would need to be appointed its parent's limited agent
under sec. 6038A(e)(1), I.R.C.  P did not obtain the
authorization of agent before R issued a notice of
deficiency.  Consequently, pursuant to sec.
6038A(e)(3), I.R.C., which grants the Commissioner the
authority to determine in her sole discretion the cost
of goods sold and deductions arising out of
transactions between a domestic corporation and a
related foreign corporation, R determined that P's cost
of goods sold should be decreased and eliminated a net
operating loss (NOL) carryforward which originated from
P's 1989 and 1990 tax years.  In addition, R disallowed
P's deduction for consulting fees paid to an unrelated
domestic corporation and applied the accuracy-related
penalty.

    Held, sec. 6038A, I.R.C., applies to P for the
year at issue.  Held, further, P failed to obtain the
authorization of agent required by sec. 6038A(e)(1),
I.R.C.  Held, further, R did not abuse her discretion
when she adjusted P's cost of goods sold and NOL under
sec. 6038A(e)(3), I.R.C.  Held, further, P may not
deduct the consulting fees as it did not prove that the
expense was ordinary and necessary.  Held, further, P
is liable for the accuracy-related penalty.

    James E. Merritt, Linda A. Arnsbarger, and Thomas H. Steele, for petitioner.[1]

    Mary E. Wynne, Michael F. Steiner, and Grace L. Perez-Navarro, for respondent.

    VASQUEZ, Judge:  Respondent determined a deficiency in petitioner's Federal income tax in the amount of $407,592 and an accuracy-related penalty under section 6662(a)[2] of $81,518 for its taxable year ending April 30, 1991.  Although respondent gave alternative grounds for each adjustment in the notice of deficiency, her first ground in regard to petitioner's cost of goods sold and net operating loss was section 6038A(e)(3), which grants the Commissioner the authority to determine in her sole discretion the cost of goods sold and expenses arising out of transactions between a domestic corporation and a related foreign

---

    [1] Counsel of record during the trial and briefing of this case was Martin A. Schainbaum.

    [2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

corporation (the section 6038A issues).  As resolution of the section 6038A issues could negate the need for a trial of issues involving section 482 (section 482 was an alternative ground for the adjustments), we conducted a separate trial of the section 6038A issues.  With this background in mind, the issues for decision are:

(1) Whether section 6038A applies to petitioner for its tax year ending April 30, 1991; and, if so,

(2) whether there was a failure to authorize petitioner as its parent's agent under section 6038A(e)(1); and, if so,

(3) whether respondent's determination under section 6038A(e)(3), reducing petitioner's cost of goods sold by $1,494,437, was an abuse of discretion;[3]

(4) whether respondent's determination under section 6038A(e)(3), eliminating petitioner's NOL carryforward of $165,147, was an abuse of discretion;

(5) whether petitioner may deduct consulting fees of $280,922;[4] and

(6) whether petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence.

---

[3]  References to "abuse of discretion", unless otherwise indicated, are in the context of a sec. 6038A analysis.

[4]  Petitioner's entitlement to the consulting fee deduction is not a sec. 6038A issue.  See infra.

FINDINGS OF FACT

Petitioner, ASAT, Inc., is a corporation organized under the laws of California.  At the time the petition was filed, its principal place of business was in Palo Alto, California.

Petitioner's Organizational Structure

From December 22, 1988, to at least June 30, 1992 (a period which includes petitioner's fiscal year ended April 30, 1991, the year in issue), petitioner was a wholly owned subsidiary of ASAT, Ltd., a Hong Kong corporation.  During its fiscal year ended April 30, 1991, ASAT, Ltd., was 85 percent owned by a subsidiary of QPL International Holdings Ltd. (QPL), a Bermuda corporation with offices in Hong Kong.  Mr. Li Tung Lok (Mr. Li) was chairman of the board and the largest single shareholder of QPL during 1990 and 1991.  Petitioner became 95 percent owned by Worltek International Ltd. (Worltek), a domestic corporation organized in California, when Worltek purchased 95 percent of petitioner's stock directly from petitioner on July 15, 1992.   On November 9, 1994, QPL acquired 100 percent of the stock of Worltek.  Hence, petitioner, once again, became an indirect subsidiary of QPL.

Petitioner's Business[5]

Petitioner located semiconductor companies (customers) that wanted their semiconductor dies put into an assembly package.  These customers contracted with petitioner for assembly services

---

[5]  Unless otherwise indicated, descriptions of petitioner's business pertain to its fiscal year ending Apr. 30, 1991.

to be provided by ASAT, Ltd., petitioner's foreign parent. Customers provided the product by drop shipment directly to ASAT, Ltd., in Hong Kong, for assembly. Petitioner coordinated the transaction, sometimes handling the freight forwarding. ASAT, Ltd., invoiced petitioner, which then invoiced its customer for the agreed upon purchase price (the contract price). After the customer paid petitioner the contract price, petitioner paid the invoice received from ASAT, Ltd., by remitting 94 percent of the contract price to ASAT, Ltd., retaining 6 percent for itself.[6] During the fiscal year immediately prior to the year in issue, petitioner paid ASAT, Ltd., 100 percent of the amounts collected from petitioner's customers.[7] Petitioner reported its receipt of the contract price on its 1991 Federal corporate income tax return (tax return) as "Gross receipts or sales". Petitioner reported its payments to ASAT, Ltd. for assembly services under "Cost of goods sold".[8]

---

[6] The 6-percent retained portion of the contract price will sometimes be referred to as the "gross profit spread" for convenience. Petitioner and respondent referred to the gross profit spread as a "commission" and to the 6-percent amount as the "commission rate" at trial and on brief for convenience. Although the gross profit spread is similar to a commission, we are dealing with respondent's determination of the proper amount of petitioner's payments to its parent, not with the proper amount of a commission paid by the parent to petitioner.

[7] The reason petitioner remitted the entire contract price to ASAT, Ltd., in the tax year ending Apr. 30, 1990, is not in the record.

[8] The characterization of the payments in question as cost of goods sold rather than as a deduction does not affect the
(continued...)

ASAT, Ltd., had no sales people located in the United States during its fiscal year ended April 30, 1991. Petitioner made purchases on behalf of ASAT, Ltd. There were no written agreements between petitioner and ASAT, Ltd., regarding the purchases petitioner made on ASAT, Ltd.'s, behalf. Petitioner paid for all advertising in the United States for itself and ASAT, Ltd.

Internal Revenue Service (IRS) Audit of Petitioner

Respondent's examination of petitioner's tax year ending April 30, 1991 (hereinafter the examination), began when a notification of the examination was sent to petitioner on July 17, 1992. The examination continued until December 21, 1994, the date the statutory notice of deficiency was issued. Nanette Alexander Hamilton was the International Examiner who examined petitioner's tax return for the tax year ended April 30, 1991. During the examination, Ms. Hamilton met with petitioner's tax counsel, Martin Schainbaum, and with Fe Maliwat, Robert Borawski, and Conrad Chapple, all representatives of petitioner. Ms. Maliwat was petitioner's controller from April 13, 1991, to December 31, 1992. In addition to providing documents to Ms. Hamilton, Ms. Maliwat responded to inquiries and explained certain aspects of petitioner's business operations. Mr. Borawski was petitioner's counsel and corporate secretary during

---

[8](...continued)
outcome of this case.

the examination.  Mr. Chapple has been petitioner's chief financial officer and senior executive vice-president from January 1, 1993, to the present.  Prior to 1993, Mr. Chapple was president of Worltek.

During the examination Ms. Hamilton issued 11 Information Document Requests (IDR's) to petitioner.  Ms. Hamilton asked for the agreements and the basis of how the pricing, commissions, and service rates were established between petitioner and ASAT, Ltd., as well as agreements between petitioner, ASAT, Ltd., and unrelated parties.  Petitioner never provided these documents, though petitioner provided copies of invoices to show actual pricing.  By letter dated October 23, 1992, Ms. Hamilton advised petitioner's tax counsel that she relied on section 6038A as her authority to request the documents.

Ms. Hamilton requested a worldwide organization chart; Hong Kong income tax returns filed by ASAT, Ltd.; an audited financial statement of ASAT, Ltd., covering the period under examination; internal financial statements of ASAT, Ltd., broken down by product line and subsidiary location; and business plans, market studies, feasibility studies, corporate minutes, etc., conducted or developed by ASAT, Ltd., in relation to the organization and expectations for petitioner.  This documentation was requested again in a section 6038A summons issued on October 5, 1993.  During a meeting on September 24, 1992, Mr. Schainbaum advised Ms. Hamilton that petitioner would not produce the information

requested on the grounds that the "taxpayer is not ASAT, Ltd."
During the meeting on September 24, 1992, Ms. Hamilton advised
Ms. Maliwat of section 6038A, that respondent had the authority
to request documents concerning ASAT, Ltd., and that she needed
the documents to conduct the examination.  The worldwide
organization chart, the Hong Kong income tax returns, audited
financial statements, and certain internal financial statements
of ASAT, Ltd., were provided to respondent on October 17, 1995,
after the statutory notice of deficiency was issued.  No business
plans, market studies, feasibility studies, or corporate minutes
were provided to respondent.  We cannot tell from the record
whether these items existed or were in the possession of
petitioner.

Ms. Hamilton notified petitioner's representatives,
including Mr. Borawski, during a meeting on June 14, 1993, that
she was considering an upward adjustment in petitioner's gross
profit spread to 14 percent by lowering its cost of goods sold.

Petitioner's Business as Described by Petitioner's
Representatives to Ms. Hamilton

During the examination, Ms. Hamilton was told by Mr.
Borawski and Ms. Maliwat that petitioner provided advertising for
the assembly services of ASAT, Ltd.  During the initial interview
of the examination, Mr. Borawski advised Ms. Hamilton that
petitioner's business was contract representative services for
ASAT, Ltd.

During the initial interview, Ms. Hamilton recorded in her notes that she was told by Mr. Borawski and Ms. Maliwat that petitioner was at risk of loss if collection of accounts receivable was not made, that petitioner provided warranties for the assembly services of ASAT, Ltd., and that petitioner provided a 30-day warranty on workmanship and labor.

Ms. Maliwat explained to Ms. Hamilton that petitioner purchased, on behalf of ASAT, Ltd., some materials and equipment. However, the purchasing effort did not require substantial time or effort as there were probably only five purchases a week.

IRS's Application of Section 6038A

A.  Notice of Noncompliance

On November 25, 1992, respondent sent a certified letter to petitioner and petitioner's counsel requesting that petitioner be authorized as agent of ASAT, Ltd. pursuant to the provisions of section 6038A(e)(1) and section 1.6038A-5 Income Tax Regs.  When respondent issued the request for authorization of agent to petitioner, Worltek owned 95 percent of petitioner's stock. Petitioner advised respondent by letter dated January 26, 1993, that "agency status has not been granted to ASAT, Inc. from ASAT, Ltd."  Petitioner did, however, obtain an authorization of agent from ASAT, Ltd., on July 26, 1995, after the notice of deficiency was issued.

On June 14, 1993, respondent sent petitioner a certified letter notifying petitioner that respondent was considering

application of section 6038A(e)(3) (hereinafter sometimes referred to as the noncompliance penalty) for failure to provide an authorization of agent.  On January 3, 1994, respondent sent petitioner a certified letter notifying petitioner that she had applied the noncompliance penalty because petitioner had not provided respondent with its appointment as agent for ASAT, Ltd., and that the noncompliance penalty would be reflected in a notice of deficiency.  Respondent also informed petitioner that she would be applying the noncompliance penalty for failure to comply with a summons that she issued to petitioner.

B.    Information in Commissioner's Possession

At the initial interview of the examination on August 26, 1992, petitioner's representatives provided Ms. Hamilton with the following documents:

a.    Advertising brochures and folders;

b.    Table of Contents;

c.    Organization;

d.    ASAT, Inc. Chart of Accounts;

e.    Trial Balance 1991;

f.    ASAT, Inc. General Ledger FY 1991;

g.    Cash Receipts FY 1991;

h.    ASAT, Inc. Cash Disbursements FY 1991;

i.    ASAT, Inc. Sales Journal FY 1991;

j.    ASAT, Inc. Freight Invoice Journal FY 1991;

k.    Adjusting entries;

l.    ASAT, Inc. Intercompany Transactions FY 1991;

m.    Interco 1989 & 1990;

n.    Form 1120 (1989); and

o.    Form 1120 (1990).

All of these documents were in respondent's possession at the time the notice of deficiency was issued.

Respondent also had the following documents in her possession when the notice of deficiency was issued:

a.    Correspondence between petitioner, petitioner's counsel, and respondent;

b.    notes taken by Ms. Hamilton;

c.    initial interview questions and notes of the initial interview;

d.    the Manufacturers' Agents National Association (MANA) materials;

e.    Duns Market Identifier for petitioner dated August 25, 1992; and

f.    a copy of petitioner's tax return for the fiscal year ended April 30, 1992.

C.    <u>Information Not Available or Not in Existence</u>

Petitioner did not provide to respondent any budget plans, work plans, business plans, or other documents showing the expected income and expenses of petitioner for the years ending April 30, 1989, through April 30, 1992.  Nor did petitioner provide to respondent any price lists or price guidelines showing the prices charged by petitioner and/or ASAT, Ltd., to third parties.

Petitioner did not make available to respondent any advertising copy, press releases, brochures, videos, or other documents distributed to third parties concerning the services offered by either petitioner or ASAT, Ltd., during the years ending April 30, 1989, through April 30, 1992.

During the examination, Ms. Hamilton requested information regarding how petitioner's gross profit spread was set on sales of ASAT, Ltd.'s, assembly services. Neither petitioner nor ASAT, Ltd., provided any documentation to Ms. Hamilton regarding how petitioner's gross profit spread was set on sales of ASAT, Ltd.'s, assembly services. Petitioner did not provide Ms. Hamilton with any information as to which company, petitioner or ASAT, Ltd., set the gross profit spread.

During the examination, petitioner did not provide respondent with any documentation on petitioner's anticipated costs, profits, or break-even points from its transactions with ASAT, Ltd. We cannot tell whether this information was not available or was not in existence. Petitioner did not provide Ms. Hamilton with an analysis or projection of income or expenses for petitioner. Petitioner did not know what commission rate it would need to charge ASAT, Ltd., in order to be profitable.

D.   Application of Section 6038A

The Internal Revenue Manual provides procedures for the use and application of section 6038A. Ms. Hamilton followed the

Internal Revenue Manual procedures during the examination in this case.

During the examination, Ms. Hamilton was also auditing another taxpayer that provided services similar to those provided by petitioner, that is, selling the integrated circuit assembly services of its foreign parent. The other taxpayer received a commission rate ranging from 11 to 15 percent. The other taxpayer had three separate divisions. Two of these divisions were distributors of goods. The third division was similar to petitioner in that it found customers for the integrated circuit assembly services of the foreign parent. There was separate accounting for each activity. The division which found customers for the services of the foreign parent had no warehousing expenses and no inventory.

To assist in her determination as to the appropriate amount of petitioner's gross profit spread, Ms. Hamilton consulted with an economist employed by respondent, Ron McGinley. During the examination, Ms. Hamilton related to Mr. McGinley what petitioner's representatives told her about petitioner's business and what petitioner's functions were with respect to its sales. Mr. McGinley provided Ms. Hamilton with information from the examination of another taxpayer presenting an issue concerning services rendered similar to that in petitioner's case. Mr. McGinley advised Ms. Hamilton that, based upon the functions

performed and risks borne by petitioner, a gross profit spread of 10 to 15 percent was appropriate.

During the examination, Mr. McGinley provided copies of the following documents to Ms. Hamilton:

a.   The 1992 MANA Research Bulletin Survey of Sales Commissions;

b.   the 1990 MANA Research Bulletin Survey of Sales Commissions;

c.   an article entitled "Compensating Manufacturers' Agents:  Guidelines for Determining Agency Commissions, Fees and Incentive Programs";

d.   an article entitled "Guidelines for Determining Agency Commissions, Fees Incentive Programs"; and

e.   the 1992 MANA Survey of Manufacturers' Sales Agency Annual Revenues and Expenses.

The MANA Research Bulletins provide data concerning the sales commissions charged by agents to their principals.  The MANA Research Bulletin states:

> Typically, an agent and a manufacturer will offer what they feel is a fair rate for the work to be done when they negotiate their contract. * * *  But, in general, fair is a figure whereby both parties can make money and where both are pleased with the arrangement. * * *
>
>       *   *   *   *   *   *   *
>
> The important point to remember is that a commission rate should be determined empirically to insure that you and your agencies can make money--read profits.
>
>       *   *   *   *   *   *   *
>
>     Decide specifically what the agent is expected to do in order to receive his basic commission compensation.

Determine what services, in addition to those needed to determine the basic commission rate, will be needed.

Determine whether the additional services will be paid for as increased commissions or as special fees.

*   *   *   *   *   *   *

[T]he one factor that ultimately rules the marketplace is whether or not the agent feels he or she can make a decent living with a given commission. * * *

*   *   *   *   *   *   *

[W]hile [many] agents receive most of their income as sales commissions, many are also paid fees for special services.  The typical manufacturers' agency today is as likely to perform some special marketing tasks for its principals as it is to do its main job of selling the products.

Ms. Hamilton interpreted the MANA Research Bulletins as "[making] it clear that if entities perform additional functions they should be compensated--additionally compensated for those functions."

The MANA Research Bulletin reports sales commission rates in the categories high, low, and average.  In the product category of Electronic/Technical Products, the MANA Research Bulletins show commission ranges of 6.97 percent to 12.19 percent in 1990 and 7.32 percent to 12.30 percent in 1992.  The average rates in those years were 9.58 percent and 9.81 percent, respectively. Petitioner performed functions and other activities in addition to selling the services of ASAT, Ltd.  Ms. Hamilton read the MANA materials prior to determining her adjustment to petitioner's gross profit spread.

Ms. Hamilton prepared a "what if" scenario showing the resulting profit attributable to petitioner for gross profit spreads of 10 percent through 15 percent. In her report on Form 4665, Report Transmittal, Ms. Hamilton states, "Providing a commission [gross profit spread] in the upper range insures that the TP will report profits from its activities. In no case should the commission be reduced below 10 percent. Ten percent (10%) is the lowest commission which would result in profit (See What-if Scenario workpaper)." If the gross profit spread was below 10 percent there would be no tax liability. Ms. Hamilton testified that there would be no need to process the case if no additional tax liability would result.

Ms. Hamilton was guided by temporary regulations under section 482 which indicated that ranges should be used, even though she believed the regulations did not apply retroactively.

As a result of the examination and based upon the information she had, Ms. Hamilton determined that based on the additional functions petitioner performed, it should receive a gross profit spread above the average commission rate shown in the MANA Research Bulletin for sales services alone. For the additional services and functions, Ms. Hamilton determined that petitioner should be compensated an additional 5 percent above the average rate of approximately 10 percent as shown in the MANA materials.

Ms. Hamilton was told by Mr. Borawski that, in his opinion, the industry average for this type of commission [gross profit spread] was 5 percent. Ms. Hamilton knew of Mr. Borawski's 20 years of experience in the industry. Ms. Hamilton considered Mr. Borawski's opinion, but did not adopt it in forming her conclusion.

E.   Deficiency Notice

The notice of deficiency was mailed to petitioner on December 21, 1994. The notice of deficiency states:

> As required by Section 6038A(e)(1) of the Internal Revenue Code and Section 1.6038A-5 of the Income Tax Regulations, the foreign related party, ASAT, Ltd., with which you have engaged in transactions, has failed to provide the Internal Revenue Service an authorization of agent within 30 days of the request by letter from the Internal Revenue Service dated November 25, 1992. See Section 1.6038A-5(b) of the Income Tax Regulations.   * * *
>
> Therefore, the noncompliance penalty adjustment under Section 6038A(e)(3) has been imposed; accordingly, your cost of goods sold [consulting fees expense, net operating loss deduction] has been determined based on information available to the Internal Revenue Service. * * *

Consulting Fees

In 1990, Mr. Li contacted a friend, Mr. Chapple, president and 50-percent shareholder of Worltek, and thereafter hired Worltek to perform an evaluation or review of petitioner. During 1990 and 1991, two employees of Worltek, Mr. Combs and Mr. Smith, performed services that were billed to petitioner. Mr. Combs

worked half-time for Worltek and half-time for petitioner.[9]
There were no written contracts relating to the hiring or
retention of Worltek employees by petitioner during 1990 and
1991.  Worltek sent petitioner the following invoices:[10]

| Date | Description | Amount |
|------|-------------|--------|
| 11/9/90 | Consultant fees for W.D. Smith for the calendar month of November | $31,000 |
| 2/15/91 | Consulting fees for W.D. Smith and Edward Combs for the month of February 1991 | 51,000 |
| 3/12/91 | Consultant fees for W.D. Smith and Edward Combs for the calendar month of March | 31,000 |
| 4/10/91 | Consultant fees for W.D. Smith and Edward Combs for the calendar month of April | 55,300 |
| 5/10/91 | To bill for consulting fees for the month of April 1991 | |
| | William D. Smith   24,916 Edward G. Combs   38,716 | 69,632[11] |

These invoices were marked either "Payable upon receipt" or
"Payable on sight".  Handwritten notations on the invoices
indicate that petitioner paid them promptly.

_____

[9]  The record does not show what percentage of time Mr.
Smith worked for petitioner.

[10]  These invoices were provided to respondent in response
to an IDR; the record does not show if these were the only
invoices sent by Worltek to petitioner.

[11]  Worltek's total was incorrect.

OPINION

The interpretation and application of section 6038A involve issues of first impression; there are but two published cases[12] that discuss section 6038A.

In her notice of deficiency, respondent cited the section 6038A(e)(3) noncompliance penalty as statutory support for her determination. Section 6038A(e)(3) is available to respondent if a taxpayer fails to maintain specified records and to honor a summons as required by section 6038A(e)(2) or if a taxpayer fails to obtain authorization to be a related foreign corporation's agent as required by section 6038A(e)(1). As respondent's notice of deficiency relies on section 6038A(e)(1), we focus on that section and its relationship to section 6038A(e)(3).[13]

A.   Whether Section 6038A Applies to Petitioner

Section 6038A provides in pertinent part:

-------

[12]   Asat, Inc. v. United States, 76 AFTR 2d 95-7821, 95-2 USTC par. 50,498 (N.D. Cal. 1995); Nissei Sangyo Am., Ltd. v. United States, 76 AFTR 2d 95-5736, 95-2 USTC par. 50,327 (N.D. Ill. 1995).

[13]   The notice of deficiency is predicated on the failure by petitioner to obtain ASAT, Ltd.'s authorization of agent. Petitioner's failure, however, to comply with the summons issued by respondent as required by sec. 6038A(e)(2), and to seek timely judicial review of the notice of noncompliance as required by sec. 6038A(e)(4), appears to provide respondent with an additional ground for applying the noncompliance penalty adjustment of sec. 6038A(e)(3). See Asat, Inc. v. United States, supra.

SEC. 6038A.  INFORMATION WITH RESPECT TO CERTAIN
            FOREIGN-OWNED CORPORATIONS.

(a) Requirement.--If, at any time during a taxable year, a corporation (hereinafter in this section referred to as the "reporting corporation")--

(1) is a domestic corporation, and

(2) is 25-percent foreign-owned,

such corporation shall furnish, at such time and in such manner as the Secretary shall by regulations prescribe, the information described in subsection (b) and such corporation shall maintain * * * such records as may be appropriate to determine the correct treatment of transactions with related parties as the Secretary shall by regulations prescribe * * *.

* * * * * * *

(c) Definitions.--For purposes of this section--

(1) 25-percent foreign-owned.--A corporation is 25-percent foreign-owned if at least 25 percent of--

(A) the total voting power of all classes of stock of such corporation entitled to vote, or

(B) the total value of all classes of stock of such corporation,

is owned at any time during the taxable year by 1 foreign person (hereinafter in this section referred to as a "25-percent foreign shareholder").

Hence, recordkeeping, reporting, and authorization of agent requirements under section 6038A apply to "reporting corporations" who have "transactions" with "related parties".

1.   Reporting Corporation

Section 6038A(c)(1) defines a reporting corporation as a domestic corporation that is 25-percent foreign-owned, meaning

ownership by one foreign person of either 25 percent of the voting stock or 25 percent of the value of all classes of the domestic corporation's stock. A "foreign person" is any person who is not a "United States person" under section 7701(a)(30), including a corporation. Sec. 6038A(c)(3); sec. 1.6038A-1(f)(3), Income Tax Regs. Petitioner stipulated that it always has been a corporation and from December 22, 1988, to June 30, 1992, that it was wholly owned by a foreign corporation, ASAT, Ltd. Consequently, petitioner is a "reporting corporation" for its year ending April 30, 1991, the taxable year covered by the notice of deficiency.

2.  Related Party

Section 6038A(c)(2)(A) defines a "related party" to include any 25-percent foreign shareholder of the reporting corporation. ASAT, Ltd., owned 100 percent of petitioner at all times during the year in issue. Thus, ASAT, Ltd., is a "related party" to petitioner for its taxable year ending April 30, 1991.

3.  Transaction

Section 1.6038A-2(a)(2), Income Tax Regs., provides a definition of "transaction" in the context of triggering Form 5472 filing requirements: "A reportable transaction is any transaction of the types listed in paragraphs (b)(3) and (4) of this section."

Section 1.6038A-2(b)(3), Income Tax Regs., provides in part:

(3) <u>Foreign related party transactions for which only monetary consideration is paid or received by the reporting corporation</u>.  If the related party is a foreign person, the reporting corporation must set forth on Form 5472 the dollar amounts of all reportable transactions for which monetary consideration * * * was the sole consideration paid or received during the taxable year of the reporting corporation. * * * The types of transactions described in this paragraph are:

* * * * * * *

(v) Consideration paid and received for technical, managerial, engineering, construction, scientific, or other services;

* * * * * * *

(x) Other amounts paid or received not specifically identified in this paragraph (b)(3) to the extent that such amounts are taken into account for the determination and computation of the taxable income of the reporting corporation.

The above provisions defining a transaction are very broad.

Indeed, petitioner does not dispute, and we hold, that it engaged

in transactions with a related party for its taxable year ending

April 30, 1991, when it contracted with and paid for assembly

services by ASAT, Ltd.  Petitioner nevertheless maintains that

section 6038A is inapplicable for the reasons set forth below.

Before those reasons are examined, however, a review of the

statute's background is in order to provide context to an

analysis of the statute and the parties' arguments.

4.   <u>Background of Section 6038A</u>

Section 6038A, as originally enacted in 1982, imposed

reporting requirements on foreign controlled U.S. corporations

and branches of foreign corporations. The Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7403, 103 Stat. 2358, added record maintenance requirements that were broadened by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11315(a), 104 Stat. 1388, to affect all open years. The IRS issued final implementing regulations on June 19, 1991. Sec. 1.6038A-1, Income Tax Regs., 56 Fed. Reg. 28056 (June 19, 1991). Section 6038A was drafted to aid the IRS in enforcement of section 482; its sponsors in the House of Representatives described it as an effort to "Improve [the] enforceability of section 482". H. Rept. 101-247, at 1295 (1989). The IRS had experienced difficulties obtaining information from foreign parents of U.S. corporations. See <u>United States v. Toyota Motor Corp.</u>, 561 F. Supp. 354 (C.D. Cal. 1983). The noncompliance penalty of section 6038A(e)(3) is among the principal enforcement mechanisms of the statute.

Section 6038A(e)(3) provides:

> (3) APPLICABLE RULES IN CASES OF NONCOMPLIANCE.-- If the rules of this paragraph apply to any transaction--
>
> > (A) the amount of the deduction allowed under subtitle A for any amount paid or incurred by the reporting corporation to the related party in connection with such transaction, and
> >
> > (B) the cost to the reporting corporation of any property acquired in such transaction from the related party (or transferred by such corporation in such transaction to the related party),

shall be the amount determined by the Secretary in the Secretary's sole discretion from the Secretary's own knowledge or from such information as the Secretary may obtain through testimony or otherwise.

5.    Contentions of the Parties

Petitioner contends that section 6038A does not apply because it was not 25 percent owned by a foreign corporation when respondent requested the authorization of agent on November 25, 1992.  Petitioner further contends that Worltek, a domestic corporation, became a "successor in interest" to ASAT, Ltd., when Worltek, on July 15, 1992, purchased newly issued stock from petitioner and became its 95-percent shareholder.  Under section 1.6038A-5(e), Income Tax Regs., a "successor in interest to a related party must execute the authorization of agent as described in paragraph (b) of this section."  Petitioner finally contends that "Section 6038A is not operative because it was a legal impossibility for Petitioner to obtain the authorization of agent."  Petitioner argues that since it "exercised considerable effort to obtain the authorization of agent from ASAT, Ltd., with no success" and since it did not have the power to compel ASAT, Ltd., to grant the authorization of agent, then it should not be penalized under section 6038A(e)(3).

Respondent argues that section 6038A is applicable to petitioner, as it is undisputed that petitioner was a reporting corporation during the year ending April 30, 1991.  According to respondent, "the status of a corporation as a 'reporting

corporation' for a particular year is unaffected by subsequent events."  Respondent correctly points out that "Neither section 6038A, the regulations thereunder, nor the legislative history contains any provision permitting a reporting corporation to avoid the requirements and penalties of that section for a particular year because of a subsequent change in stock ownership."  It is equally true, however, that section 6038A, the regulations thereunder, and the legislative history make no mention of the issue whatsoever.  The issue is not whether petitioner was a reporting corporation for the year in issue--it was--but whether section 6038A(e)(3) applies for the year in issue, an issue of first impression.

6.  Discussion

We begin our analysis with the well-established rule that statutory construction begins with the language of the relevant statute.  Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).  Statutes are to be read so as to give effect to their plain and ordinary meaning unless to do so would produce absurd or futile results.  United States v. American Trucking Associations, Inc., 310 U.S. 534, 543-544 (1940); see Tamarisk Country Club v. Commissioner, 84 T.C. 756, 761 (1985).  Moreover, where a statute is clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein.  Halpern v. Commissioner, 96 T.C. 895, 899 (1991);

Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984).  We may use legislative history to clarify an ambiguous statute.  City of New York v. Commissioner, 103 T.C. 481, 489 (1994), affd. 70 F.3d 142 (D.C. Cir. 1995).  Even where the statutory language appears clear, we may seek out any reliable evidence as to legislative purpose.  Id.

The statute applies to a reporting corporation "If, at any time during a taxable year," it has "transactions" with "related parties".  Sec. 6038A(a).  We have already established that petitioner was a "reporting corporation" that had "transactions" with a "related party" during the year in issue.  The phrase "If, at any time during a taxable year" relates to the taxable year that the reporting corporation has a transaction with a related party.  Likewise, section 6038A(e)(1) provides in part:

> The rules of paragraph (3) [the noncompliance penalty] shall apply to any transaction between the reporting corporation and any related party who is a foreign person unless such related party agrees (in such manner and at such time as the Secretary shall prescribe) to authorize the reporting corporation to act as such related party's limited agent * * * [Emphasis added.]

Again, the relevant time period is when the transaction took place.  This interpretation is consistent with the intent of Congress, as shown by legislative history.  Congress intended for the IRS to have access to the information necessary to determine if related party transactions complied with section 482.  The relevant time period for establishing a taxpayer's status as a reporting corporation is when the transaction(s) took place; the

statute speaks in those terms.  As stated by the Supreme Court in
Commissioner v. Engle, 464 U.S. 206, 217 (1984):

> Our duty then is "to find that interpretation which can
> most fairly be said to be imbedded in the statute, in
> the sense of being most harmonious with its scheme and
> with the general purposes that Congress manifested."
> NLRB v. Lion Oil Co., 352 U.S. 282, 297 (1957)
> (Frankfurter, J., concurring in part and dissenting in
> part). * * *

Petitioner would have us read into section 6038A(e) the
additional requirement that petitioner be a reporting corporation
at the time the request for authorization of agent is made upon
it by the IRS.  If the statute could be rendered inapplicable by
subsequent ownership changes in a reporting corporation, then it
might lose a substantial part of its efficacy for its stated
purpose.  A subsequent change of ownership in the reporting
corporation, after the taxable year containing the transactions
in question, does not insulate petitioner from the application of
section 6038A(e).

Petitioner further contends that "Section 6038A is not
operative because it was a legal impossibility for Petitioner to
obtain the authorization of agent."  More accurately stated,
petitioner contends that it was not able to compel its onetime
parent to provide the authorization of agent.  A subsidiary is
generally not in the position to compel its parent to perform any
act; such is the nature of a parent/subsidiary relationship.  The
legislative history to section 6038A discusses the situation
where a related party, which is not known to be such by the

reporting corporation at the time the two conduct a transaction, refuses to authorize the reporting corporation to act as its agent. In that situation, the reporting corporation "would generally be subject to the disallowance rule [noncompliance penalty] with respect to transactions" with the related party taking place prior to the time the reporting corporation became aware that section 6038A would apply. See H. Rept. 101-247, at 1299 (1989). Although this result could be called "harsh", the House report anticipated that no exception would be made unless, among other conditions, the reporting corporation did not know or have reason to know that it was conducting transactions with a related party. Id. There is no evidence, and petitioner does not argue, that it did not know that it was engaged in transactions with its sole shareholder during petitioner's 1991 tax year. We reject petitioner's argument that section 6038A should not apply because petitioner allegedly was unable to compel its onetime sole shareholder to authorize petitioner as its agent for purposes of section 6038A.

We deal next with petitioner's "successor in interest" argument. The term "successor in interest" is not defined in section 6038A or its regulations. Petitioner argues that Worltek, a domestic corporation, is a successor in interest to

ASAT, Ltd., since Worltek replaced ASAT, Ltd., as majority shareholder in petitioner.[14]

ASAT, Ltd., did not sell its stock in petitioner to Worltek; rather, after the year in issue petitioner issued stock to Worltek, which diluted the interest of ASAT, Ltd., in petitioner from 100 percent to 5 percent. Respondent correctly points out that one of the purposes of section 6038A is to allow the IRS to obtain the records of a foreign related party's transactions with a domestic corporation through the issuance of a summons. See S. Comm. Prt. 101-57, at 112 (1989). Therefore, "successor in interest" must be interpreted in that light. For section 6038A to accomplish its purpose, the IRS must be able to compel production of records from the party that has possession of, or controls the records of, the related party's transactions. In this case, the records sought are ASAT, Ltd.'s, a foreign related party, not Worltek's. Worltek succeeded to nothing of ASAT, Ltd.'s. We conclude that Worltek is not a successor in interest

---

[14] Sec. 1.6038A-5(e), Income Tax Regs., provides that "A successor in interest" to a related party must authorize the reporting corporation to act as agent. Petitioner argues that since Worltek is a domestic corporation, it cannot be required to comply with sec. 1.6038A-5(b), Income Tax Regs., which provides that "Upon request by the Service, a foreign related party shall authorize as its agent (solely for purposes of sections 7602, 7603, and 7604) the reporting corporation with which it engages in transactions." (Emphasis added.) The latter provision however, does not define "successor in interest". We shall, nevertheless, address the issue of whether Worltek is a successor in interest to ASAT, Ltd., and thus would be the proper party to execute the authorization of agent.

to ASAT, Ltd., as that term is used in section 1.6038A-5(e),
Income Tax Regs. In sum, we hold that section 6038A does apply
to petitioner.

B.  <u>Failure To Designate Agent Issue</u>

The section 6038A(e)(3) noncompliance penalty is operative
in this case if petitioner did not comply with section
6038A(e)(1), which provides:

> (e) Enforcement of Requests for Certain Records.--
>
> (1) Agreement to treat corporation as agent.--The
> rules of paragraph (3) shall apply to any transaction
> between the reporting corporation and any related party
> who is a foreign person unless such related party
> agrees (in such manner and at such time as the
> Secretary shall prescribe) to authorize the reporting
> corporation to act as such related party's limited
> agent solely for purposes of applying sections 7602,
> 7603, and 7604 with respect to any request by the
> Secretary to examine records or produce testimony
> related to any such transaction or with respect to any
> summons by the Secretary for such records or testimony.
> The appearance of persons or production of records by
> reason of the reporting corporation being such an agent
> shall not subject such persons or records to legal
> process for any purpose other than determining the
> correct treatment under this title of any transaction
> between the reporting corporation and such related
> party.

Petitioner stipulated that it did not obtain the authorization of
ASAT, Ltd., to be its agent until after the notice of deficiency
was issued. Section 1.6038A-5(b), Income Tax Regs., requires
that the authorization be provided to the IRS within 30 days
after the IRS requests it; petitioner failed to meet the
deadline.

C.  Abuse of Discretion Issue

1.  Standard of Proof

The standard of review of respondent's determination under section 6038A(e)(3) is liberal.  Whereas the word "discretion" does not appear in section 482, when the noncompliance penalty of section 6038A(e)(3) applies, "the amount of the deduction * * * and the cost * * * of any property * * * shall be the amount determined by the Secretary in the Secretary's sole discretion from the Secretary's own knowledge or from such information as the Secretary may obtain through testimony or otherwise." (Emphasis added.)  The conference committee report offers guidance to a court reviewing respondent's determination under section 6038A(e)(3):

> The conferees intend that a taxpayer seeking judicial review of the exercise of the Secretary's sole discretion under the noncompliance rules shall bear the burden of proof by clear and convincing evidence that the Secretary abused that discretion.  The conferees do not intend to foreclose a court from overturning a determination by the Secretary that was proven (by clear and convincing evidence) either to have been made with improper motive, or to have been clearly erroneous by reference to all reasonably credible interpretations or assumptions of facts.  On the other hand, the conferees do not expect a court to overturn a determination unless it could do so even after accepting as true all allegations and inferences that may support the Secretary's position.  [H. Conf. Rept. 101-386, at 594 (1989).]

The conference committee report also states:

> Under the conference agreement, in cases of noncompliance, the amount of any deduction for any amount paid or incurred to the related party by the reporting corporation, or the cost of property

transferred between such persons, shall be determined by the Secretary in the Secretary's sole discretion, based on the Secretary's own knowledge or from such information as the Secretary may choose to obtain.* * *

The conferees wish to clarify that the exercise of the Secretary's sole discretion to establish allowable amounts of deductions and the cost of goods sold in the event of noncompliance shall be subject only to limited judicial review. * * * In addition, the conferees do not expect a court to overturn a determination on grounds that the Secretary might have sought to obtain additional information but failed to do so. [Id. at 593-594.]

The standard of proof is not identical to that in a section 482 case--proving that the Commissioner's allocations are arbitrary, capricious, or unreasonable. Rather, the standard of proof under section 6038A(e)(3) requires petitioner to show by clear and convincing evidence and without reference to information not in respondent's possession or knowledge when the determination was made, that respondent's determination was made with an improper motive or is clearly erroneous in light of all reasonably credible interpretations or assumptions of facts.

Petitioner has not argued improper motive on the Secretary's part. The parties do not disagree on what information was in respondent's possession when she issued the notice of deficiency and determined that petitioner's cost of goods sold and net operating loss should be adjusted downward. Based on that information, and that information alone, we must decide if respondent abused her discretion, applying the standard set forth above, in determining the deficiency under section 6038A.

2.  Petitioner's Expert Report

Petitioner submitted an expert report[15] (the report) by Dr.
Clark Chandler,[16] which opined that it was an abuse of discretion
for respondent to have determined that petitioner should have
received a 15-percent commission [gross profit spread].[17]
Respondent objected to the admission of the report.  We allowed
the report into evidence, subject to respondent's objection.
However, we advised the parties that they could address the issue
of the report's admissibility on brief.

We found the report to be of no help to petitioner's case.
Specifically, the report utilized information not in respondent's
possession and did not accept as true credible allegations and
inferences that may support the Secretary's position.  Moreover,
the report equivocated while purporting to form a conclusion ("It
is impossible for me to verify the reasonableness of the IE's
[International Examiner] conclusions.").  The role of an expert
is to assist the trier of fact to understand the evidence or to

---

[15]  Dr. Clark Chandler prepared a report entitled "ASAT,
Inc., an Economic Evaluation of the International Examiner's
Methodology and Resulting Adjustment."

[16]  Dr. Chandler is an economist with Economic Consulting
Services.  The parties stipulated that Dr. Chandler is an expert
in the area of intercompany pricing under sec. 482.  Dr. Chandler
received his Ph.D. degrees from the University of Michigan in
1977 and 1978.  He has previously testified in numerous cases
before this Court as an expert witness in intercompany pricing.

[17]  Dr. Chandler also referred to the gross profit spread as
a "commission".

determine a fact in issue. Fed. R. Evid. 702. Under section 6038A(e)(3), we are reviewing whether respondent abused her discretion in reducing petitioner's cost of goods sold. The report itself cannot be considered as evidence of the proper gross profit spread since it was not in respondent's possession at the time the determination under section 6038A(e)(3) was made. The only function the report can serve is to help us evaluate the information that was in respondent's possession at the time the determination was made. The report failed to perform that function. The report is not appropriate expert testimony because it purports to apply a legal standard. See Laureys v. Commissioner, 92 T.C. 101, 127-129 (1989). As explained above, the test is not identical to a section 482 test, which is Dr. Chandler's area of expertise. We are not holding that an expert report is never appropriate in a section 6038A case, only that to be considered the report must be helpful in light of the standard of review called for by the statute. Dr. Chandler's report did not provide assistance in that respect.

3. Respondent's Section 6038A(e)(3) Determination

Petitioner had no documentation to show how its gross profit spread was set. Respondent, based her determination of a 15-percent gross profit spread on three main factors:

a. Experience With a Similar Taxpayer.

Ms. Hamilton was examining a taxpayer with a separate division that conducted a business similar to petitioner's. That

taxpayer engaged in selling the services of its foreign parent to assemble integrated circuits, did not maintain inventory, and had no warehousing expenses. The taxpayer (a U.S. subsidiary) received commissions ranging from 11 to 15 percent from its foreign parent.

        b.    <u>IRS Economist</u>.

Ms. Hamilton received advice from an IRS economist, Ron McGinley. Ms. Hamilton described to Mr. McGinley petitioner's business and its relationship to its foreign parent. He told her that he had experience in determining an appropriate commission rate for services and that he was currently examining a company that provided services similar to those provided by petitioner. Mr. McGinley also told Ms. Hamilton that petitioner should be compensated for each additional function performed on behalf of its foreign parent. Based on his experience, Mr. McGinley told Ms. Hamilton that a 10 to 15-percent commission range would be appropriate.

        c.    <u>MANA Survey</u>.

Mr. McGinley also gave Ms. Hamilton research bulletin surveys prepared by MANA (the MANA survey). The MANA surveys provided data concerning the sales commissions charged by manufacturing agents to their principals. In brief, the MANA survey indicated that a commission rate should enable the agent to make a profit and that additional services warrant additional fees. In the product category of Electrical/Technical Products,

the MANA survey reported that commissions ranged from 12.3 percent to 7.32 percent in 1992 and 12.19 percent to 6.97 percent in 1990.

Respondent asked for and did not receive information from petitioner regarding its contractual relationship with ASAT, Ltd., specific pricing policies, cost analysis, projections, budgets, or their negotiations in deciding on the proper gross profit spread.

Ms. Hamilton used the above factors to determine a basic gross profit spread of 10 percent and then added 5 percent (15-percent total) to compensate petitioner for the services that it rendered to ASAT, Ltd., in addition to locating customers.

4.    Petitioner's Argument

Petitioner argues that we may find respondent's determination to be clearly erroneous by focusing on either her results or her methodology.  Petitioner argues that it should be able to present evidence (expert testimony) "to show the correct costs and expenses based on the information available [not to be confused with information in respondent's possession] to the Respondent."

Petitioner states that a commission rate [gross profit spread] of 6 percent "was determined by market conditions and is economically realistic and reasonable."  To support its claim, petitioner cites a statement by Mr. Borawski (an officer and employee of petitioner) that the industry average for commissions

is 5 percent.  Petitioner also refers the Court to Dr. Chandler's report in support of petitioner's commission rate.

Petitioner argues that the IRS economist was "unauthorized IRS personnel not assigned to the case" and that respondent should have made him available for trial.[18]  Petitioner requests that the Court draw an adverse inference from respondent's not calling the economist as a witness.

Petitioner further argues that the international examiner erroneously relied on noncomparable MANA surveys.  Petitioner cites section 482 cases for the proposition that the use of industry averages is not appropriate unless the data is representative of the taxpayer.  Petitioner points out that it is not in the manufacturing business and that the MANA survey deals with manufacturers' agents.

Petitioner also argues that Ms. Hamilton "erroneously made an increase to her commission rate adjustment beyond her base adjustment."  Petitioner argues that since the MANA survey cannot be shown to have used comparable companies, it is impossible to know what services are included in the base commission rate.

Finally, petitioner argues that Ms. Hamilton's use of the "what if" scenario shows that she backed into the 15-percent

---

[18]  Despite knowing the economist's identity before petitioner prepared its pretrial memorandum and that respondent did not intend to call the economist as a witness, petitioner did not attempt to subpoena the economist until the day of the trial.

gross profit spread. Therefore, petitioner argues that the determination is an abuse of discretion.

5.  Application of Law to Facts

Petitioner would like us to perform a section 482 analysis; such an analysis would not be appropriate. Petitioner, after failing to provide respondent with basic information about its related party transactions, argues that respondent determined an incorrect gross profit spread. Petitioner's attack on respondent's results--that respondent's gross profit spread is not as accurate as petitioner's--ignores the purpose of the statute. Section 6038A was enacted to insure that the IRS either would have timely access to the information necessary to make a complete analysis of costs between related parties or the right to make an adjustment based solely on the information that it did have. Whether the taxpayer can later justify a cost is irrelevant:

> Accordingly, the amounts established by the Secretary cannot be overturned by a court on the basis that they diverge from actual costs or other amounts incurred, or on the basis that they do not clearly reflect income. The fact that amounts established by the Secretary can be proven to be clearly erroneous, by reference to information or materials that were not within the Secretary's knowledge or possession, would not alone, in the conferees' view, be sufficient cause for a court to redetermine allowable amounts of deductions and the costs of goods sold. * * * [H. Conf. Rept. 101-386, at 594 (1989).]

Petitioner argues that Ms. Hamilton should have accepted Mr. Borawski's opinion that the 6-percent gross profit spread "was

determined by market conditions and is economically realistic and reasonable" since Mr. Borawski had 20 years of experience in the industry.  Suffice it to say that the IRS is not required to accept the assertions of interested parties on faith.  In fact, the legislative history also addressed this point:

> Similarly, the exercise of the Secretary's sole discretion in determining how much weight, if any, to give to any individual document or other item of information that has been submitted is subject to the same scope of review, i.e., proof by clear and convincing evidence that the Secretary abused that discretion, while accepting as true all allegations and inferences that may support the Secretary's position. [Id.]

Petitioner's argument that Ms. Hamilton used an "unauthorized" IRS economist is without merit.  The case cited by petitioner does not support its argument.[19]  Nor will we draw an adverse inference from respondent's not calling the IRS economist as a witness.  It is not up to respondent to prove that her determination is correct; it is petitioner who has the heavy burden.

If a party fails to introduce evidence within that party's possession, we may presume in some circumstances that, if produced, the evidence would be unfavorable to that party. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  This is true where the party which does not produce the evidence has the burden of

---

[19]  Center on Corporate Responsibility, Inc. v. Shultz, 368 F. Supp. 863 (D.D.C. 1973).

proof or the other party has established a prima facie case. <u>Id.</u> Petitioner has the burden of proof and has not made a prima facie showing of the facts which it wishes to establish by adverse inference. Petitioner knew the identity of the IRS economist in ample time to call him as a witness but failed to do so. Under these circumstances we shall not draw an adverse inference against respondent.

Petitioner argues that Ms. Hamilton erroneously relied on MANA surveys, which in petitioner's view did not involve comparable companies or transactions. Although petitioner is not in the manufacturing business, it performs a service similar to a manufacturer's commissioned agent. Taking into account the materials within respondent's possession at the time of making the section 6038A(e)(3) determination, we are not persuaded that respondent's reliance on the MANA survey was misplaced.

Petitioner argues that the "what if" scenario shows that Ms. Hamilton backed into the 15-percent gross profit spread and that her suggestion that a 10-percent spread would ensure a profit shows that the determination was arbitrary. Ms. Hamilton did calculate the minimum spread necessary for petitioner to show a profit. The MANA Research Bulletin states:

> Typically, an agent and a manufacturer will offer what they feel is a fair rate for the work to be done when they negotiate their contract. * * * But, in general, fair is a figure whereby both parties can make money and where both are pleased with the arrangement. * * *

*     *     *     *     *     *     *

> The important point to remember is that a commission rate should be determined empirically to insure that you and your agencies can make money--read profits.

It was not an abuse of the Commissioner's discretion under section 6038A to assume that a fair gross profit spread is one that would allow petitioner to make an overall profit.

Petitioner also argues that Ms. Hamilton erroneously increased the gross profit spread beyond the base adjustment (from 10 to 15 percent).  However, petitioner admits that it performed additional services for ASAT, Ltd.  Given the latitude mandated by section 6038A, we cannot say that the Commissioner abused her discretion by increasing the base spread by 5-percent for the additional services.

Even without the MANA survey, Ms. Hamilton's and the IRS economist's experiences with similar taxpayers support a gross profit spread in the 10 to 15-percent range, establishing that the IRS's determination was not an abuse of discretion.  We hold that petitioner has failed to show a section 6038A abuse of discretion in respondent's determination.

D.    NOL

No NOL deduction is allowed since it was created using a 6-percent gross profit spread.[20]  Petitioner admits that a 15-percent gross profit spread in earlier years would eliminate its NOL deduction.

---

[20]  Petitioner's gross profit spread for the 1990 tax year appears to be zero.

E.   Consulting Fees

The deductibility of the consulting fees is not a section 6038A issue since it does not involve a transaction with a foreign related party; the consulting payments were made by petitioner to Worltek, a domestic corporation that was not related to petitioner at the time.  The parties presented evidence on the consulting fee issue and argued it on brief.  Therefore, we shall decide the issue.  See Rule 41(b).

Deductions are a matter of legislative grace; petitioner has the burden of showing that it is entitled to any deduction claimed.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  To be entitled to a business expense deduction for consulting fees under section 162, petitioner must prove that the expenses were:  (1) Ordinary and necessary, (2) paid or incurred in carrying on a trade or business, (3) incurred during the taxable year in which the taxpayer seeks to deduct them, and (4) paid by the person to whom the services were rendered.  Sec. 162(a).

Respondent argues that the consulting expenses were the expenses of ASAT, Ltd. or QPL, and thus not deductible by petitioner.  We need not decide the issue on that ground as petitioner has failed to show that the consulting fee expense was ordinary and necessary.  Whether an expenditure is ordinary and necessary is generally a question to fact.  Commissioner v. Heininger, 320 U.S. 467, 475 (1943).  To be "necessary" within

the meaning of section 162, an expense need be "appropriate and helpful" to the taxpayer's business. Welch v. Helvering, 290 U.S. 111, 113 (1933). The requirement that an expense be "ordinary" connotes that "the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." Deputy v. DuPont, 308 U.S. 488, 495 (1940) (citing Welch v. Helvering, supra at 114).

We question whether the consulting fees were determined on an arm's-length basis. Mr. Li and Mr. Chapple were friends. Worltek, a corporation owned 50 percent by Mr. Chapple, eventually acquired 95 percent of petitioner. QPL, a corporation whose majority shareholder was Mr. Li, later acquired Worltek. There is no evidence in the record of how the consulting fees were determined. The monthly amounts, which were usually billed on the 10th of each month, were for the half-time services of Mr. Combs and the services of Mr. Smith. The monthly fees ranged from $31,000 (for just Mr. Smith) to $124,932 (69,632 + 55,300). These relatively large amounts--given the size of petitioner's business--were promptly paid, even though there was no written contract between petitioner and Worltek and the invoices themselves provided almost no detail. There is no evidence in the record of the skills Mr. Combs and Mr. Smith may have possessed to warrant such consulting fees. We hold that petitioner has failed to prove that the consulting fees were ordinary and necessary business expenses.

F.   Section 6662(a) Accuracy-Related Penalty

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in section 6662(b), including negligence or disregard of rules or regulations.  Respondent asserts that the entire underpayment of petitioner's tax was due to negligence or intentional disregard of rules or regulations. Sec. 6662(b)(1).  As under the predecessor section covering the addition to tax for negligence, section 6653(a), petitioner bears the burden of proof on the penalty in issue.  Rule 142(a); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws.  Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.  Negligence is the failure to exercise due care or the failure to do what a reasonable and prudent person would do under the circumstances.  Neely v. Commissioner, supra.  "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

The accuracy-related penalties of section 6662 do not apply with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c)(1).  The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent

facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Id.

Reliance on a return preparer, however, may relieve a taxpayer from the addition to tax for negligence where the taxpayer's reliance is reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). A taxpayer, however, is not relieved from liability for the addition to tax for negligence merely by shifting the responsibility to a tax professional. Enoch v. Commissioner, 57 T.C. 781, 802 (1972). Reliance on an expert is not an absolute defense but is a factor to be considered. Freytag v. Commissioner, supra at 888. A taxpayer's reliance must be in good faith and demonstrably reasonable. Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Freytag v. Commissioner, supra at 888-889. In such a case, a taxpayer will be entitled to rely upon an expert's advice, even if the advice should prove to be erroneous. Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. on other issues 864 F.2d 1521 (10th Cir. 1989); Brown v. Commissioner, 47 T.C. 399, 410 (1967), affd. per curiam 398 F.2d 832 (6th Cir. 1968).

The ultimate responsibility for a correct return lies with the taxpayer, who must furnish the necessary information to the agent who prepared the return. Enoch v. Commissioner, supra at

802.  In other words, reliance upon expert advice will not exculpate a taxpayer who supplies the return preparer with incomplete or inaccurate information.  <u>Lester Lumber Co. v. Commissioner</u>, 14 T.C. 255, 263 (1950).

In this decision, except for the consulting fee issue, among the rules or regulations to be considered for applying the negligence penalty are section 6038A and the accompanying regulations.

Respondent argues that petitioner did not keep the records required by section 6038A and did not provide an authorization of agent when repeatedly asked to do so by respondent.  Respondent argues that petitioner ignored the requirements of section 6038A by not keeping records from which respondent could determine the correct tax treatment of transactions between petitioner and ASAT, Ltd., citing section 1.6038A-3(a)(1), Income Tax Regs.  Respondent points out that petitioner's 1990 tax return preparer, a C.P.A. from Deloitte & Touche, informed petitioner in writing that it "noted concern" in the level of documentation and in intercompany pricing.  Respondent further argues that petitioner has not introduced any evidence that it has reasonable cause for failure to comply with section 6038A.

Petitioner argues that:

The evidence adduced at bar demonstrates that
Petitioner was not negligent. * * *

Petitioner charged a 6% commission rate to ASAT,
Ltd.  The average commission rate is 5%.  Under all the

circumstances of industry competition and individual customer order specifications, there is substantial economic justification for the rate used by Petitioner and reported on its income tax return. * * *

Petitioner further argues that its C.P.A. used "boiler plate" language regarding intercompany transaction recordkeeping requirements. Finally, petitioner argues that it gave its tax return preparer the information necessary to prepare its return.

Unfortunately for petitioner, the "evidenced adduced at bar" does not demonstrate that the industry average commission rate was 5 percent. Petitioner confuses the self-serving, unsupported testimony of its officer with proof. Saying something is so does not make it so. Petitioner had no records whatsoever to document how it determined the value of ASAT, Ltd.'s services, a requirement under section 6038A. Petitioner has not shown that it attempted to comply with the recordkeeping requirements of the statute. Petitioner cannot escape the penalty by blaming its tax return preparer; petitioner's tax return preparer warned petitioner that intercompany transactions require documentation. That this warning was "boiler plate" does not make it any less true. We hold that petitioner has failed to prove that it was not negligent on the section 6038A issues.

Petitioner has offered no evidence that it was not negligent in deducting the consulting fees and does not address the issue on brief. Respondent's determination of the applicable penalty

must be sustained as petitioner has not met its burden of proof on this issue.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.