T.C. Memo. 1999-56


UNITED STATES TAX COURT


FRANK K.B. WHEELER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8269-97.                    Filed February 26, 1999.


During 1993, 1994, and 1995, P conducted a videotape activity.  P bought significant amounts of equipment, claimed large deductions (primarily depreciation), and generated little receipts during the years in issue.

1.  <u>Held</u>:  On the facts, P's activity was not engaged in for profit; deductions in excess of income from the activity were properly disallowed.  Sec. 183, I.R.C. 1986.

2.  <u>Held</u>, <u>further</u>, P is liable for negligence additions to tax.  Sec. 6662, I.R.C. 1986.


<u>Barbara Morlan DeCaro</u>, for petitioner.

<u>Steven L. Walker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, <u>Judge</u>:  Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6662(a)[1] (accuracy-related) against petitioner as follows:

| Year | Deficiency | Additions to tax Sec. 6662(a) |
|------|-----------|-------------------------------|
| 1993 | $5,471 | $1,094 |
| 1994 | 6,969 | 1,394 |
| 1995 | 8,341 | 1,668 |

After concessions,[2] the issues for decision are as follows:

1.  Whether petitioner's Schedule C activity of making and selling videotapes (hereinafter sometimes referred to as petitioner's videotape activity) was "not engaged in for profit" within the meaning of section 183 for 1993 through 1995; and

2.  Whether petitioner is liable for negligence additions to tax under section 6662(a) for 1993 through 1995.

---

[1]    Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1986 as in effect for the years in issue.

[2]    The parties have stipulated that (1) petitioner paid or incurred all the expenses reported on his Schedule C for each of the years in issue, (2) these expenses are not "start-up expenditures" within the meaning of sec. 195, and (3) if the Court holds that petitioner's videotape activity constituted a trade or business, then all these expenses are deductible.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner resided in Los Altos Hills, California.

Petitioner's Background

Petitioner is a retired captain from the U.S. Navy, where he served for 29 years from 1931 to 1960. He is a 1935 graduate of the U.S. Naval Academy, where he received bachelor's degrees in both electrical and mechanical engineering. After his service on the U.S.S. Jouett and before his service on the U.S.S. Kearny (see infra), petitioner took a postgraduate course in "Radio Engineering" (now known as Electronics Engineering), earning a degree which he believes to be the equivalent of a Ph.D. This course was taught at the U.S. Naval Academy. Because of World War II, this 3-year course was compressed into roughly 2 years. Also, petitioner earned a master's degree in the National Economy and took business courses through Harvard University, receiving a master's degree in business.

After petitioner was graduated from the U.S. Naval Academy, he served aboard the U.S.S. Minneapolis from 1935 through 1937. From 1937 through 1938, petitioner was on a Fleet Staff called "Commander Cruisers Scouting Force Staff". Petitioner was on the

U.S.S. Jouett from 1938 through 1942.  He commanded a destroyer, the U.S.S. Kearny, during World War II from 1944 until the end of the war.  From 1946 to 1948, petitioner was the Fleet Electronics Officer for the entire Pacific Fleet and shore activity.

From 1948 to 1951, petitioner was the Electronics Officer for all U.S. Navy ships in the Office of the Chief of Naval Operations in Washington, D.C.  From 1951 to 1953, petitioner was the Electronics Officer for Mare Island Naval Shipyard and the Industrial Manager for the 12th Naval District.  He was responsible for all new electronics facilities in the Pacific Ocean area, building four major communication facilities and providing air navigation facilities for the entire Pacific.  From 1953 to 1955, petitioner was again the Pacific Fleet Electronics Officer and was responsible for all joint military and Navy work in the Pacific.  From 1955 to 1958, petitioner was head of Ships Electronics with the Bureau of Ships for the entire Navy, including the Merchant Marine and the Coast Guard.  From 1958 to 1960, petitioner was the Planning Officer for Pearl Harbor Naval Shipyard.

After retiring from the U.S. Navy in 1960, petitioner worked for Hewlett-Packard in California until about 1970.  After leaving Hewlett-Packard, petitioner worked for Fairchild Electronics for 2 years and then began working full time for Wheeler and Associates, his own engineering consulting firm,

which he had started in 1960. The firm included about 16 consultants. In the early days of the firm, petitioner concentrated on the technical/consulting end of the business, and Kensington Management Consultants, Inc., handled the firm's administration.

Since 1961, petitioner has been a registered civil and professional engineer in California. He has kept his license current. Petitioner is also a member of the following professional societies: (1) American Association for the Advancement of Science, (2) U.S. Naval Institute, (3) American Society of Naval Engineers, (4) American Institute of Electrical Engineers, (5) U.S. Naval Academy Alumni Association, (6) National Geographic Society, (7) Commonwealth Club, and (8) the Institute of Electrical and Electronics Engineering.

Videotape Activity

Around 1985, when petitioner was 72 years old, he began focusing primarily on making videos. He has conducted his videotape activity in his home of 25 years. Petitioner has been transferring home slides, movies, and prints onto videocassettes and also creating his own videos.

Petitioner kept a log of his video sales showing (1) date of sale, (2) number of videos sold, (3) buyer's name, (4) name of video sold, and (5) sale price for each video. The log

constitutes all of petitioner's books from his videotape activity.[3]

Petitioner has devoted one room in his home to his videotape activity. Petitioner's reference items in that room include: (1) Reference books such as The Technique of Film Editing, and The Technique of the Film Cutting Room, (2) instruction manuals for the video and audio equipment, and (3) numerous other magazines and publications.

Petitioner has at least 30 video projects, for a total of at least 75 tapes, covering the topics described in tables 1 through 4, infra.

Travel Videos

Petitioner and his wife (she died in 1991) vacationed throughout the world. Petitioner videotaped and sold copies of the videotapes of these vacations primarily to people who petitioner and his wife either met on their excursions or traveled with. Table 1 summarizes these videotapes.

Table 1

1. Golden Odyssey Cruise - This two-tape set covers a cruise to the Mediterranean on The Royal Cruise Line. Petitioner sold six copies of the video for a total of $240.

---

[3] So stipulated. Evidently petitioner's expenses are not recorded in the form of books but presumably are in the form of records, which are sufficiently complete and accurate so as to enable the parties to stipulate the correctness of all the expense amounts reported on petitioner's Schedule C for each year in issue. Supra note 2.

2.  Cruise Around the World - This six-tape set covers a cruise around the world on The Royal Cruise Line.  The cruise took about 6-8 weeks. Petitioner sold six copies of the video for a total of $270.

3.  Cruise East Coast of South America - This two-tape set covers a 3-week cruise along the east coast of South America.  Petitioner sold five copies of the video for a total of $200.

4.  Trip to Spain and Portugal - This video covers a trip to Spain and Portugal.  Petitioner sold seven copies of the video for a total of $140.

5.  Norway Cruise - This two-tape set covers a cruise down the coast of Norway, from Russia to Bergen, Norway.  Petitioner sold six copies of the video for a total of $240.

6.  Cruise Around New Zealand, Australia, and Tasmania - This two-tape set covers a cruise around New Zealand (both islands), Australia, and Tasmania. Petitioner sold five copies of the video for a total of $200.

7.  Kenya Trip - This two-tape set covers a trip to Kenya, Africa.  Petitioner sold six copies of the video for a total of $240.

8.  Eastern Europe Trip - This two-tape set covers a trip to Eastern Europe.  Petitioner sold six copies of the video for a total of $240.

9.  Cruising Mother Russia - This three-tape set covers a cruise that petitioner took with his grandson from St. Petersburg to Moscow. Petitioner sold four copies of the video for a total of $240.

10. Amazon Cruise - This two-tape set covers a cruise down the Amazon.  Petitioner sold four copies of the video for a total of $160.

Navy Videos

Petitioner has remained involved with the U.S. Navy since he retired in 1960.  He regularly attends Navy reunions and has stayed in touch with U.S. Naval Academy classmates and with shipmates.  Petitioner is an active member of the U.S. Naval Academy Alumni Association.  As a result of his lifelong personal interest in the Navy, petitioner has made videotapes about the Navy and his experiences.  For example, he made a videotape about his 1935 graduating class of the U.S. Naval Academy and a videotape about the U.S.S. Minneapolis, which he showed at a reunion of the personnel of the U.S.S. Minneapolis.  Petitioner has given some of his Navy videotapes to such places as the Department of the Navy, the U.S. Naval Academy, and the Hoover Institution.  Table 2 summarizes these videotapes.

Table 2

1.   Captain K.G. Schacht Video - This video covers Captain K.G. Schacht's experiences in a Japanese prisoner-of-war camp during World War II.  Captain Schacht was one of petitioner's classmates at the Naval Academy.  As of the trial date, petitioner had not yet completed the video and had not sold any copies.

2.   Shakedown Cruise U.S.S. Minneapolis - This video covers the U.S.S. Minneapolis' maiden voyage in 1934.  Petitioner was on this ship from 1935-1937, after having been graduated from the Naval Academy in 1935.  Petitioner sold four copies for a total of $80.  Petitioner received inquiries about the video after it was mentioned in an alumni newsletter for the U.S.S. Minneapolis.

3.  U.S.S. Minneapolis - This two-tape set covers the U.S.S. Minneapolis and petitioner's experiences aboard the ship from 1935-1937. Petitioner sold six copies for a total of $240.

4.  Nobel Prize Award - Petitioner made this two-tape set in the early 1980's for a former shipmate who won the Nobel Prize in Economics [James Tobin]. The video covers the award ceremony and the pre-award dinner with the King and Queen. Petitioner sold one copy for $40 and gave the video to the shipmate's family.

5.  Memorial of Captain Paul Ryan - This video covers the burial at Arlington National Cemetery of a close friend of petitioner who was a Naval officer. Petitioner thinks he sold one copy for $20, and he gave a video to the family.

6.  Memorial of Captain Joe Lyle - This video covers the burial at Arlington National Cemetery of one of petitioner's classmates from the Naval Academy. Petitioner sold two copies for a total of $40.

7.  U.S.S. Kearny Story - This video covers the U.S.S. Kearny, a destroyer that petitioner commanded during World War II. Petitioner sold 68 copies for a total of $1,360.

8.  Class of 1935 Naval Academy - This video covers petitioner's 4 years at the Naval Academy from 1931-1935. Petitioner sold 65 copies for a total of $1,318. Petitioner has copyrighted this video.

9.  Naval Academy Class of 1936 - This video covers the 1936 graduating class of the Naval Academy. Petitioner sold 11 copies for a total of $220.

10. Anchors Aweigh - This six-part set covers events in the 1930's. It includes historic newsreels, movies clips, pictures, and sound bites from radio shows. Petitioner has not completed the video series and plans to extend it to the 1960's. Petitioner has given copies to such places as the National Archives, the Naval History Museum in Washington, D.C., and the Naval Academy. Petitioner believes that he sold between three and five copies at $120 each.

11. Captain Austin - This two-tape set covers family pictures of one of petitioner's close friends and classmates from the Naval Academy. Petitioner sold four copies to the family for a total of $160.

12. General Muehleison - This set covers family pictures of General Muehleison, petitioner's acquaintance. Petitioner sold three copies to the family for a total of $60.

Wedding and Family Videos

Petitioner also made family and wedding videotapes for friends and acquaintances. Table 3 summarizes these videotapes.

Table 3

1. Jane and Joe Shea's Wedding - This video covers the wedding of Jane and Joe Shea, who were petitioner's close friends. Petitioner gave the video to the family and did not sell any.

2. Rhonda and Lou's Wedding - This video covers the wedding of Rhonda and Lou, who are friends of petitioner's son. Petitioner sold two videos for a total of $40.

3. Bill and Louise Kaiser's Wedding Anniversary - This video covers the 50th wedding anniversary of petitioner's close friend from kindergarten.

4. Poppy and DeLanney Clagett - This video covers family pictures of a close friend and classmate from the Naval Academy. Petitioner gave the video to the family and did not sell any because, as of the trial date, it was not yet completed.

5. Our Son Harold - This video is about Harold Hahn when he was an infant. He was a child of Mrs. Hahn, who was petitioner's secretary. As of the trial date, petitioner had not yet completed the video series but had been paid $200 for his work from 1993 through 1995.

6. John and Priscilla Buchan - This three-tape set covers family pictures of the Buchans. John Buchan worked for petitioner at Wheeler and Associates. Petitioner sold two copies for a total of $120.

Miscellaneous Videos

Table 4 summarizes miscellaneous videotapes that petitioner made and sold.

Table 4

1. Dancer's Way - This is a promotion video for Delores Gay, a dancer who worked with Bob Hope. Petitioner sold about eight copies for a total of $308.

2. Marketing Resource Group - This business paid petitioner to videotape its business meeting. Petitioner sold the video for $300.

Video Sales 1993-1995

From 1993 through 1995, petitioner had videotape sales as shown in table 5.

Table 5

| Year | Sales |
|------|-------|
| 1993 | $238 |
| 1994 | 20 |
| 1995 | 180 |
| Total | 438 |

Petitioner did not sell any of the videotapes listed in table 1 during 1993 through 1995.

In 1993, petitioner sold $238 of videotapes. This consisted of $38 for one copy of the videotape listed as item 8 in table 2

and the $200 petitioner received for his work on the videotape listed as item 5 in table 3. These are all of the videotapes that petitioner sold in 1993.

In 1994, petitioner sold only one video for $20. This video is item 1 in table 4.

In 1995, petitioner sold $180 of videos. As of the trial date he had not yet collected the money from these sales. These videos are not listed in tables 1 through 4, and the videos were for a project that petitioner was working on.

Operation of Petitioner's Activity

Petitioner did not formulate any written business plan or make any substantive financial projections before starting his videotape activity. He did not have any written business plan in existence from 1993 through 1995, forecasting his videotape activity's income, expenses, or net profit or loss. Petitioner did not maintain separate bank accounts for his personal funds and the funds from his videotape activity.

Petitioner had incurred $155,553 of costs for videotape equipment by the end of 1995, of which $74,977 was incurred from 1993 through 1995. Petitioner concedes that this equipment will not appreciate in value.

Petitioner did not spend any money on advertising from 1993 through 1995. He relied solely on "word-of-mouth" to generate sales of his videos from 1993 through 1995. Petitioner did not

advertise because he already had as much business as he could handle himself; he did not want his videotape activity to become "a big company."

Petitioner reported the income and expenses from his videotape activity on Schedule C from at least 1985 through 1995. His videotape activity has generated losses every year since inception. Petitioner used the losses to offset his income. That income has included his Navy pension, dividend income, interest income, capital gains, and Social Security benefits. Table 6 shows petitioner's adjusted gross income (before the Schedule C loss), Schedule C gross receipts, Schedule C gross income, Schedule C expenses, the Schedule C losses that he used to offset his income, and adjusted gross income after Schedule C loss.

Table 6

| Year | AGI before Schedule C loss | Schedule C gross receipts | Schedule C gross income | Schedule C expenses[1] | Schedule C loss[1] | Adjusted gross income |
|------|------|------|------|------|------|------|
| 1985 | $48,679 | $890 | ($937) | $3,506 | ($4,443) | $44,236 |
| 1986 | 45,271 | 1,675 | (213) | 3,016 | (3,229) | 42,042 |
| 1987 | 58,255 | 333 | (1,987) | 4,757 | (6,745) | 51,510 |
| 1988 | 165,311 | 1,592 | 1,123 | 6,900 | (5,778) | 159,533 |
| 1989 | 80,365 | 409 | (1,793) | 6,805 | (8,598) | 71,767 |
| [2]1990 | -- | -- | -- | -- | -- | -- |
| 1991 | 69,055 | 698 | 375 | 12,138 | (11,876) | 57,179 |
| 1992 | 66,534 | 883 | 690 | 15,638 | (15,039) | 51,495 |
| 1993 | 70,768 | 238 | (306) | 18,171 | (18,570) | 52,198 |
| 1994 | 72,191 | 20 | 15 | 23,862 | (23,942) | 48,249 |
| 1995 | 77,196 | -0- | -0- | 28,302 | (28,401) | 48,795 |
| 1996 | 77,937 | 60 | 60 | 27,332 | [3](27,272) | 77,937 |

[1]  For 1991 through 1995, the amounts stipulated by the parties as petitioner's Schedule C expenses do not include expenses for business use of petitioner's home, but the amounts stipulated by the parties as petitioner's Schedule C losses do take account of expenses for business use of petitioner's home.  The expenses for business use of the home for 1991 through 1995 range from a high of $113.46 (1991) to a low of $91.53 (1992).

[2]  The parties were unable to obtain information regarding 1990.  However, they stipulated that petitioner's videotape activity generated a loss for this year.

[3]  Although petitioner reported the $27,272 loss on Schedule C for 1996, he did not carry this loss over to his Form 1040.

Petitioner owned an avocado farm.  Table 7 shows the gross income and total expenses that petitioner reported on his Schedules F and the amount of farm income or (loss) that petitioner reported on the first page of his Forms 1040.

Table 7

|  | Schedule F | | |
| Year | Gross income | Total expenses | Form 1040 |
| 1985 | -0- | $3,749.19 | -0- |
| 1986 | -0- | 1,532.54 | -0- |
| 1987 | -0- | 914.81 | ($914.81) |
| 1988 | $113.00 | 1,638.28 | (1,525.28) |
| 1989 | -0- | 5,796.57 | -0- |
| 1991 | -0- | 2,108.88 | -0- |
| 1992 | -0- | 4,002.43 | -0- |
| 1993 | -0- | 956.89 | -0- |
| 1994 | -0- | 3,577.59 | -0- |
| 1995 | -0- | 4,438.50 | -0- |
| 1996 | N/A | N/A | -0- |

Petitioner prepared his own tax returns for each of the years in issue and for the prior years.  Petitioner's 1996 tax return was prepared by a paid tax return preparer.

_____

Petitioner did not engage in his videotape activity for profit.

Petitioner was negligent with respect to his tax treatment of his videotape activity; the entire deficiency for each year in issue was due to this negligence.

OPINION

## I. Sec. 183--Activity Not Engaged In For Profit

Both parties base their cases on their respective analyses of a list of factors often considered in so-called "hobby loss" cases. Each party concludes that substantially all the factors point to a conclusion favoring that side.

In general we agree with respondent's analyses; we also agree with respondent's conclusion.

In the context of the instant case, the effect of section 183[4] is that petitioner's disputed deductions are allowable but

_____

[4]    Sec. 183 provides, in pertinent part, as follows:

SEC. 183.   ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a)   General Rule.--In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter [i.e., chapter 1, relating to normal taxes and surtaxes] except as provided in this section.

(b)   Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed--

    (1)   the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

    (2)   a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c)   Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.


Sec. 162 provides, in pertinent part, as follows:

SEC. 162.   TRADE OR BUSINESS EXPENSES.

(a)   In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

Sec. 212 provides, in pertinent part, as follows:

(continued...)

only if his videotape activity was engaged in for profit.

Whether an activity is engaged in for profit is determined under section 162 and section 212 (except insofar as section 183(d) creates a presumption that the activity is engaged in for profit). See sec. 183(c). Whether an activity is engaged in for profit turns on whether the taxpayer has an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Petitioner's objective is a question of fact to be determined from all the facts and circumstances. Polakof v. Commissioner, 820 F.2d 321, 324 (9th Cir. 1987), affg. T.C. Memo. 1985-197; Allen v. Commissioner, 72 T.C. 28, 34 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (2d Cir. 1979), affd. on another issue 615 F.2d 578 (2d Cir. 1980). Mere statements of intent are not determinative.

_____

[4](...continued)
SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year--

     (1)  for the production or collection of income;
     (2)  for the management, conservation, or maintenance of property held for the production of income * * *

Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Engdahl v. Commissioner, 72 T.C. at 666; Churchman v. Commissioner, 68 T.C. 696, 701 (1977).  The burden of proof is on petitioner.  Rule 142(a); Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d at 727; Golanty v. Commissioner, 72 T.C. at 426; Boyer v. Commissioner, 69 T.C. 521, 537 (1977).

In general, for these purposes the "profit" that must be sought is taxable income, Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d at 726; Brannen v. Commissioner, 78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984), or economic profit independent of tax savings.  Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656, 659 (4th Cir. 1990).

Section 1.183-2(b)(1) through (9), Income Tax Regs., sets out the following factors (principally derived from case law, see Benz v. Commissioner, 63 T.C. 375, 382-383 (1974)), to be taken into account in determining a profit objective, or lack of one: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort spent by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the

activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. No one factor is conclusive, and we do not reach our decision herein by merely counting how many of the nine enumerated factors support each party's position. Carter v. Commissioner, 645 F.2d 784, 787 (9th Cir. 1981), affg. T.C. Memo. 1978-202; Dunn v. Commissioner, 70 T.C. at 720. We consider these factors seriatim.

(1) Manner of Carrying on the Activity

The parties have stipulated the accuracy of petitioner's Schedule C for each year in issue. Supra note 2. Also, respondent did not determine, and does not assert, that petitioner omitted to report any receipts from his videotape activity. From the foregoing, we conclude that petitioner's books and records, though sparse and relatively informal, were adequate for a trade or business.

By the end of 1992, petitioner was faced with a record of fluctuating gross receipts which were trending somewhat downward, and losses which were more-or-less consistently increasing. Supra table 6. He had spent about $80,000 on equipment. His reported losses from his videotape activity, including straight-line depreciation, aggregated about $55,000, plus whatever he reported on his 1990 tax return. Supra table 6, note 2. His reaction to this state of affairs was to buy another $75,000 of

equipment and spend most of the next 3 years learning how to use the new equipment. His gross receipts plummeted; his losses increased even more. Supra tables 5 and 6.

The parties have stipulated that petitioner did not have a written business plan, forecasting income, expenses, and net profit or loss, during the years in issue, and had not prepared any such written business plan before starting his videotape activity. When asked about this at trial, petitioner responded as follows:

> Q [Ms. DeCaro] Why did you not prepare a business plan?
>
> A [Petitioner] Well, I have my business plan in my head and that's one of my businesses that I was doing when I was actually consulting was preparing business plans, and it seemed like a silly waste of paper to put it down in black and white.

Petitioner did not present us with an oral description of the business plan that was in his head.

Petitioner noted at trial that his father had continued to operate his own business until dying at age 92. When questioned on cross-examination, petitioner did not give any indication as to how long he thought it would take for him to earn enough income from his videotape activity to recoup the $155,000 or so that he had spent on equipment.

The parties have stipulated that petitioner did not spend any money on advertising from 1993 through 1995; he relied solely on "word-of-mouth". Petitioner's Schedules C also show that he

did not spend any money on advertising from 1985 through 1989, 1991, 1992, and 1996. (The record does not include the information for 1990.) We understand that many a successful small business relies on word-of-mouth to increase its patronage or maintain patronage at a satisfactory level. However, as supra tables 2 through 6 show, petitioner's patronage remained at meager and unprofitable levels throughout the period for which we have evidence in the record. Petitioner did not advertise or, so far as we can tell from the record, take any other steps to try to move his videotape activity into the profit column. Indeed, petitioner testified that he already had as much work as he could handle. The only facet of his activities that showed significant changes are the fairly steady increases in expenses and losses. Supra table 6.

On the whole, although petitioner's books and records were sufficient, the rest of his videotape activity does not appear to have been carried on in a businesslike manner.

(2) Expertise of Taxpayer or Advisers

Petitioner's background in electronics and communications is impressive. Petitioner also has a master's degree in business. Petitioner consulted reference books such as The Technique of Film Editing and The Technique of The Film Cutting Room, instruction manuals for the video and audio equipment, and numerous other magazines and publications. Petitioner has had

extensive managerial experience covering numerous positions including running his own engineering consulting firm and commanding a destroyer during World War II.

This factor favors petitioner.

## (3) Time and Effort Spent in the Activity

Petitioner testified that, on average, he spent about 50 to 60 hours per week on his videotape activities. On brief, petitioner claims only about 30 hours per week. In either event, it is evident that petitioner spent substantial time and effort on his videotape activities, making this a factor pointing toward a profit objective.

## (4) Expectation That Assets May Appreciate in Value

A taxpayer's "bona fide expectation" that assets used in a questioned activity will appreciate in value is a factor pointing toward a conclusion that the taxpayer engaged in the questioned activity for profit. Engdahl v. Commissioner, 72 T.C. at 668-669; Allen v. Commissioner, 72 T.C. at 36.

The parties have stipulated that "petitioner had incurred $155,553 of costs for video equipment by the end of 1995, of which $74,977 was incurred from 1993-1995." On brief petitioner concedes that this equipment "will not increase in value".

This factor favors respondent.

(5) Taxpayer's Success in Other Activities

Petitioner had a long and successful military career. Petitioner then worked for large electronics companies. He then worked for an engineering consulting firm which he had founded. The record does not indicate how successful petitioner was in his civilian jobs. We cannot tell from the record that any of petitioner's jobs were sufficiently similar to his videotape activity so that his degree of success in those jobs would be helpful in predicting success in his videotape activity.

(6) History of Income or Losses From the Activity

Petitioner's videotape activity produced a loss for every year since the activity's inception. As supra table 6 shows, the losses trended upward with only minor fluctuations. By the end of the last year in issue, petitioner was already past 80 years old, with no indication that he would give up his videotape activity and no indication that he would make any major change in the way he conducted his videotape activity.

A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, by the time of the years in issue, petitioner's videotape activity was no longer in its initial or startup stage. Although the parties' stipulation "that the expenses on petitioner's Schedule C for 1993 to 1995 do not represent startup cost" was evidently directed primarily to

respondent's alternative contention (since abandoned) under section 195, we are entitled to take it into account in evaluating petitioner's history of losses from his videotape activity.

Nowhere in the record do we find a coherent explanation of any plan by petitioner to produce a profit from his videotape activity in either the short run or the long run.

This factor favors respondent.

(7) Amount of Occasional Profits Earned

There were not any occasional profits from petitioner's videotape activity. Indeed, as supra table 6 shows, as often as not there was not even gross income from petitioner's videotape activity. The fluctuations in gross income were minor, compared to the steady progression of increasing Schedule C expenses.

This factor favors respondent.

(8) Taxpayer's Financial Status

Before petitioner's wife's death, petitioner's videotape activity losses were generally around 10 percent of his adjusted gross income before the losses. After petitioner's wife's death, the loss percentages increased, but a new pattern emerged--the losses from petitioner's videotape activities left him with about $50,000 adjusted gross income each year. If petitioner would have deducted his 1996 Schedule C loss, that would have produced a 1996 adjusted gross income of $50,665. Supra table 6.

On brief, petitioner contends that "the mere fact that a taxpayer has a substantial income from other sources does not foreclose a profit motive." We agree. This is but an illustration of the proposition that no one factor is conclusive.

The record does not show that petitioner needed profits, or even gross income, from his videotape activity. His other income apparently was substantial enough, even after the videotape losses, to maintain his life style. The record does not include any indication that petitioner feared that any of his major income sources was going to "dry up" and that he thought it prudent to engage in his videotape activity to develop a replacement source of income. Compare the instant case with Nickerson v. Commissioner, 700 F.2d 402, 403, 406 (7th Cir. 1983), revg. T.C. Memo. 1981-321.

This factor favors respondent.

## (9) Elements of Personal Pleasure

Petitioner took great pains to provide high quality videotapes. His methods were not slapdash. He preserved his, his family's, his classmates', his shipmates', and his friends' memories. He preserved history. He enjoyed what he did. As we have noted, "a business will not be turned into a hobby merely because the owner finds it pleasurable". Jackson v. Commissioner, 59 T.C. 312, 317 (1972). Thus, petitioner's enjoyment of his work should not be a factor in respondent's

favor. By the same token, it is not a factor in petitioner's favor.

Conclusions

From 1985 through the end of 1992, just before the years in issue, (1) petitioner had incurred about $80,000 of costs for video equipment, (2) petitioner had lost increasing amounts of money for each of the 8 years since he embarked on his videotape activity, and (3) petitioner was approaching age 80. During the 3 years in issue, (1) petitioner incurred about $75,000 more of costs for video equipment, (2) petitioner's videotape sales totaled $438, of which he had collected only $258 by the time of the trial, and (3) petitioner lost another $70,000 on his videotape activity. Petitioner's age ordinarily would not be relevant to our determination. However, petitioner's substantial capital investment at that age makes it more important that petitioner be able to show that he really intended to earn enough to (1) recoup his capital investment and also (2) earn a profit on that capital investment.

Petitioner seemed to be unable to articulate any plan, or even any moderately clear vision, for profitability of his videotape activity.

We conclude, and we have found, on the basis of the preponderance of the evidence, that petitioner did not engage in his videotape activity for profit.

We hold for respondent on this issue.

## II. Section 6662--Negligence

Respondent determined that petitioner is liable for a 20-percent negligence addition to tax on the entire underpayment for each year in issue.

Respondent contends that petitioner "failed to act reasonably in claiming increasingly larger expenses and losses on Schedule C from 1993-1995." Respondent relies on Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996).

Petitioner maintains that he had reasonable cause for his actions--in particular that he was following advice from one of respondent's employees and from respondent's Schedule C instructions. Petitioner also maintains that he acted in good faith, as is shown by the disclosures on his tax returns. Petitioner relies on Osteen v. Commissioner, 62 F.3d 356 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-519.

Neither side suggests, even by way of a fallback position, that one part of the underpayment may be due to negligence and the other part not due to negligence.

We agree with respondent's conclusion.

Section 6662[5] imposes an accuracy-related penalty of 20

percent of any portion of an underpayment that is attributable to

the taxpayer's negligence.  Subsecs. (a) and (b)(1) of sec. 6662.

---

[5]     Sec. 6662 provides, in pertinent part, as follows:

SEC. 6662.   IMPOSITION OF ACCURACY-RELATED PENALTY.

(a)  Imposition of Penalty.--If this section applies to any
portion of an underpayment of tax required to be shown on a
return, there shall be added to the tax an amount equal to 20
percent of the portion of the underpayment to which this section
applies.

(b)  Portion of Underpayment to Which Section Applies.--This
section shall apply to the portion of any underpayment which is
attributable to 1 or more of the following:

    (1)  Negligence or disregard of rules or regulations.

        *     *     *     *     *     *     *

(c)  Negligence.--For purposes of this section, the term
"negligence" includes any failure to make a reasonable attempt to
comply with the provisions of this title, [title 26, the Internal
Revenue Code] and the term "disregard" includes any careless,
reckless, or intentional disregard.

Sec. 6664 provides, in pertinent part, as follows:

SEC. 6664.   DEFINITIONS AND SPECIAL RULES.

        *     *     *     *     *     *     *

(c)  Reasonable Cause Exception.--

    (1)  In general.--No penalty shall be imposed under
this part with respect to any portion of an underpayment if
it is shown that there was a reasonable cause for such
portion and that the taxpayer acted in good faith with
respect to such portion.

For purposes of the instant case, "underpayment" is the same as "deficiency".  Compare sec. 6664(a) with sec. 6211(a).

Broadly speaking, for purposes of this provision, negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances to determine that person's income tax liability.  ASAT, Inc. v. Commissioner, 108 T.C. 147, 175 (1997); Cluck v. Commissioner, 105 T.C. 324, 339 (1995).  Reasonable and good faith reliance by a taxpayer on an accountant or attorney may be sufficient to avoid the addition to tax for negligence.  See United States v. Boyle, 469 U.S. 241, 251 (1985).  Petitioner has the burden of proving error in respondent's determination that these additions to tax should be imposed against him.  Little v. Commissioner, 106 F.3d 1445, 1449-1450 (9th Cir. 1997), affg. T.C. Memo. 1993-281; Korshin v. Commissioner, 91 F.3d 670, 671 (4th Cir. 1996), affg. T.C. Memo. 1995-46; ASAT, Inc. v. Commissioner, 108 T.C. at 175.

Petitioner was in the witness box for about 2½ hours.  On the basis of our observation, as well as the record in the instant case, we conclude that petitioner is an articulate and able man of integrity.  He makes up his mind on the basis of the information he has.  If he feels the need for additional information, or advice, or instruction, then he seeks it.  If he feels that no further information, advice, or instruction is

needed, then he does not seek it.  He does what he believes to be appropriate and does not do what he believes to be superfluous, regardless of the views of others.

Thus, petitioner does not bother with written business plans.  This would make less difference if petitioner had business plans in his head.  But petitioner was unable to articulate any plans that he had as to how his videotape activity was going to--or that he hoped would--produce a profit.

Petitioner did not offer any explanation of why he treated his avocado-raising losses, shown on the Schedule F for each tax return, differently from the way he treated his Schedule C videotape activity, deducting the latter losses but ordinarily not deducting the former losses.  _Supra_ table 7.

It appears that, at some undetermined time in the early 1980's, some unidentified IRS employee suggested that petitioner use Schedule C in connection with some activity that may have been a precursor of petitioner's videotape activity.

Petitioner's reliance on the advice assertedly given to him by an IRS employee a decade or so earlier is not exculpatory because the record does not show what information petitioner gave to the IRS employee and exactly what advice the IRS employee gave to petitioner.  Compare, e.g., _Howard v. Commissioner_, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531, with _Weis v. Commissioner_, 94 T.C. 473, 486-488 (1990).  From the sparse

information in the record, we conclude that, regardless of what an IRS employee may have mentioned to petitioner in the early 1980's, by the time of the years in issue petitioner should have sought advice from experts who could evaluate the implications of a decade of increasing losses in petitioner's videotape activity. In light of the increasing magnitude of petitioner's loss deductions, a reasonable and ordinarily prudent person would have sought such advice. Petitioner failed to make a reasonable attempt to comply with the provisions of sections 183, 162, and 212, and the decade-old advice by the IRS employee is not reasonable cause for petitioner's failure.

Petitioner's reliance on Osteen v. Commissioner, 62 F.3d 356 (11th Cir. 1995), is misplaced. Osteen dealt with whether the taxpayers therein had "substantial authority" for their tax treatment of an item, within the meaning of former section 6661(b)(2)(B)(i). Osteen v. Commissioner, 62 F.3d at 359. That provision appears now as section 6662(d)(2)(B)(i), a qualification in the application of the substantial understatement addition to tax under section 6662. The substantial authority language does not appear in section 6662(c) (relating to the definition of "negligence"), nor does it appear in section 6664(c)(1) (relating to the reasonable cause exception). For an example of the differences between a negligence analysis and a substantial-understatement analysis see

<u>Little v. Commissioner</u>, 106 F.3d at 1449-1451, 1451-1453. <u>Osteen</u> does not affect our analysis in the instant case.

For completeness, we note that respondent's reliance on <u>Sacks v. Commissioner</u>, T.C. Memo. 1994-217, also is misplaced. In <u>Sacks</u>, the taxpayers invested in a tax shelter, the prospectus for which projected that in the first 3 years of the investment the taxpayers would be able to deduct 350 percent of their cash outlay. The prospectus prominently displayed the fact that the investment had significant tax risks and could well be challenged by the Internal Revenue Service. We held the taxpayers were liable for the negligence additions to tax, and the Court of Appeals affirmed. <u>Sacks v. Commissioner</u>, 82 F.3d 918 (9th Cir. 1996), affg. T.C. Memo. 1994-217. There is no indication in the record in the instant case that petitioner's deductions exceeded his actual cash outlays or that petitioner engaged in his videotape activity for any substantial tax reduction purpose.

We have held, <u>supra</u>, that petitioner did not engage in his videotape activity for profit.

By the time of the years in issue, a reasonable and ordinarily prudent person would have sought competent advice on the deductibility of the expenses of this videotape activity. Petitioner failed to make a reasonable attempt to do so. We conclude, and we have found, on the basis of the preponderance of the evidence, that petitioner was negligent and that the entire

deficiency for each of the years in issue was due to this negligence.

We hold for respondent on this issue.

Decision will be entered

for respondent.